**SAMUEL H. ESTERKYN, M.D., INC. PENSION SHARING AND PROFIT SHARING PLAN**

v.

**VAN HEDGE FUND ADVISORS, INCORPORATED, et al.**

No. 3:98–0303.

United States District Court, M.D. Tennessee, Nashville Division.

Aug. 23, 1999.

---

5. Subsections (H)(1) and (4) speak to selling, transferring, assigning, renting and leasing which are not at issue here.

David Neilson Burn, Stokes & Bartholomew, Nashville, TN, Mark Rollinson, Leesburg, VA, for Plaintiffs.

Ames Davis, Waller, Lansden, Dortch & Davis, Nashville, TN, Timothy B. Hyland, Leffler & Hyland, Fairfax, VA, Carl N. Duncan, Duncan, Blum & Associates, Bethesda, MD, Ramsey Barthell Leathers, Jr., Leathers, Beam & Mitteldorf, PLLC, Nashville, TN, Hal D. Hardin, Nashville, TN, for Defendants.

### MEMORANDUM

HIGGINS, District Judge.

The plaintiff, Samuel H. Esterkyn, M.D., Inc. Pension and Profit Sharing Plan, a California pension plan, filed this action under 28 U.S.C. § 1331 asserting violations of Section 10(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78u–4(b)(1), against the defendants: Van Hedge Fund Advisors, Inc., a Tennessee corporation; Steven A. Lonsdorf, Van Hedge's president and a Tennessee citizen; Compass Series E, Ltd., an investment company organized under the laws of the Commonwealth of the Bahamas; Beacon Global Advisors, Ltd., an asset management consulting firm with its principal place of business in Nassau, New Providence, Bahamas; Demachy Worms &

Company International, Ltd., a Bahamian bank; Beacon Global Advisors, Inc., a Delaware corporation with its principal office in McLean, Virginia; Renaud Anselin, a director of Compass E and resident of the Bahamas; Ronald W. Springle, a senior officer as well as director of Compass E and Demachy, and a Bahamian resident; and John F. Watts, a senior officer as well as director of Compass E and Demachy, and a Bahamian resident.

In an amended complaint, the plaintiff added as party defendants: John H. Groth, a senior officer of Beacon, Inc. and Robert Henrich, a senior officer in Beacon, Ltd. First amended complaint (filed August 24, 1998; Docket Entry No. 43) ¶¶ 11 and 12.

The plaintiff also asserts state law claims of intentional and negligent misrepresentations and breach of contract against these defendants under the federal diversity statute, 28 U.S.C. § 1332.

The plaintiff's claims arise out of its investment of $500,410.00 in Compass E stock. This investment was allegedly based upon representations made by the defendant Lonsdorf, defendant Van Hedge's agent to one of the Plan's trustees that this investment was appropriate based upon the work of Compass E's investment manager Ben Bush. First amended complaint (Docket Entry No. 43) ¶¶ 17 and 19. Among the sales materials that were sent to the Plan's trustees was a brochure that cited Mr. Bush's performance record of a 42 percent compound annual rate of return for investors over the last eight and one-half years and that this performance record had been audited by Campbell, Campbell & Co. *Id.,* ¶¶ 17 and 18.

According to the allegations in the first amended complaint, the plaintiff's investment took a dramatic fall in value and further inquiry revealed that, in fact, there had not been any audit of Mr. Bush's performance and the auditing firm was a fictitious entity. *Id.,* ¶ 19. The representations that were made about Mr.

Bush's performances are alleged to have been exaggerated and false, and Compass E's prospectus implied that Mr. Bush's performance record was Compass E's performance record. In addition, when the Plan exercised its redemption rights, it did not receive the full value of its depreciated stock, giving rise to the plaintiff's breach of the contract claim.

In earlier proceedings, the Court denied motions to dismiss filed by defendants Beacon, Ltd., Compass E and Van Hedge asserting legal insufficiencies of the complaint. Order (entered June 5, 1998; Docket Entry No. 24). By order (Docket Entry No. 35) entered June 18, 1998, the Court denied motions to dismiss filed by defendants Demachy, Anselin, Springle, and Watts. These motions also challenged the legal sufficiency of the complaint.

By order (Docket Entry No. 42) entered August 20, 1998, the Court granted the plaintiff's motion (filed August 7, 1998; Docket Entry No. 39) to file an amended complaint that was filed August 24, 1998. By order (Docket Entry No. 87) entered November 10, 1998, the Court, however, denied plaintiff's motion (Docket Entry No. 55) to file a second amended complaint, but at the March 22, 1999 pretrial conference, allowed the plaintiff to amend its theory of the case to assert wilful fraud. Transcript of proceedings (filed April 2, 1999; Docket Entry No. 100) at 21.

Pending before the Court are the following motions:

1. Motion (filed September 8, 1998; Docket Entry No. 47) to dismiss by defendants Compass E; Beacon, Ltd.; Beacon, Inc.; Groth and Henrich;

2. Motion (filed September 8, 1998; Docket Entry No. 49) to dismiss by defendants Compass E; Beacon, Ltd.; Groth and Henrich;

3. Motion (filed September 21, 1998; Docket Entry No. 58) for summary judgment by defendants Demachy, Anselin, Springle and Watts;

4. Motion (filed September 21, 1998; Docket Entry No. 62) for summary judgment by defendants Compass E; Beacon, Ltd.; Beacon, Inc.; Groth and Henrich;

5. Motion (filed September 22, 1998; Docket Entry No. 67) for summary judgment by defendants Van Hedge and Lonsdorf;

6. Motion (filed December 29, 1998; Docket Entry No. 94) *in limine* by the plaintiff;

7. Motion (filed December 2, 1998; Docket Entry No. 91) to show cause by defendants Demachy, Anselin, Springle and Watts;

8. Motion (filed March 26, 1999; Docket Entry No. 99) to amend pretrial order by defendants Compass E; Beacon, Ltd.; Beacon, Inc.; Groth and Henrich;

9. Motion (filed May 24, 1999; Docket Entry No. 103) to file supplemental materials and to file a supplemental argument by the defendants; and

10. Plaintiff's motion (filed June 1, 1999; Docket Entry No. 105) to amend the style of case.

## I.

Of the several motions, the Court considers first the plaintiff's motion to amend because in these circumstances, as a matter of law, such motion must be decided first. Moreover, the disposition of this motion directly impacts several of defendants' legal contentions in their motions for summary judgment.

### 1. Plaintiff's Motion to Amend

In the motion to amend the style of the case, citing Federal Rule of Civil Procedure 15(a), the plaintiff essentially is moving to amend its complaint to effect a substitution of parties by naming Samuel E. Esterkyn, M.D. and Sharon M. Esterkyn, the Plan's trustees, as the named parties on behalf of the Samuel H. Esterkyn, M.D., Inc. Pension and Profit Sharing

Plan. This is a response to the defendants' motions that challenge the Plan's standing to pursue these claims.

■ Given the pendency of the motions for summary judgment, the Court must consider the plaintiff's motion to amend and substitute the Plan's trustees as the named plaintiffs first. Failure to consider a motion to amend before considering a pending motion for summary judgment is an abuse of discretion. *Ellison v. Ford Motor Co.,* 847 F.2d 297, 300–01 (6th Cir. 1988).

Under Federal Rule of Civil Procedure 15(a), the pleadings are to be liberally construed when justice so requires. Of the factors to be considered on a motion to amend under Rule 15(a), *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Court finds no undue delay, bad faith or dilatory motive by the plaintiff. Although plaintiff was allowed a prior opportunity to amend its complaint, the Court earlier denied motions to dismiss based upon plaintiff's alleged lack of standing. *See* Docket Entry Nos. 23, 24, 25 and 35. Should the Court grant this amendment, there has been no showing of prejudice to any defendants. The Court notes that there has been no opposition filed to the plaintiff's motion to amend to effect this substitution. Under Local Rule 8(b)(3), the failure to file a response is deemed to be an admission that there is no opposition to the motion. Accordingly, the Court grants the plaintiff's * motion to amend by deeming Dr. and Mrs. Esterkyn to be party plaintiffs in their capacity as trustees. However, the caption shall remain the same.

## 2. Defendants' Motion to Amend

Defendants Compass E; Beacon, Ltd.; Beacon, Inc.; Groth and Henrich move to amend the pretrial order to add factual assertions to their theory of the case. This motion is granted.

---

\* From this point, the plaintiffs will be referred to in the plural or by name, or as trustee or

## 3. Defendants' Motion to Show Cause

In this motion, defendants Demachy, Watts, Springle and Anselin move the Court to require plaintiffs' lead counsel to show cause why, on his own initiative, he attempted to contact an employee of Demachy who is represented by counsel but who was not consulted on this attempt. Plaintiffs' counsel does not dispute his letter that made direct contact with an official of the United States Embassy in the Dominican Republic seeking to speak with a representative of Demachy about whether its counsel in this action is actually Demachy's representative.

The Court concludes that this attempt to speak with a Demachy representative was improper, as such persons are represented by the employer's counsel. *Upjohn Co. v. United States,* 449 U.S. 383, 391–97, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The Court directs the plaintiffs' lead counsel to refrain from any further such attempts and finds that no additional sanction is warranted under the circumstances.

## 4. Defendants' Motions to Dismiss

In their motion to dismiss (Docket Entry No. 47), defendants Compass E; Beacon, Ltd; Beacon, Inc.; Groth and Henrich argue that the plaintiffs' first amended complaint fails to set forth a claim under Section 10(b)(5) of the Securities Act of 1934. Particularly, these defendants assert that there is no allegation that any of them made a false statement or failed to disclose a material fact that should have been disclosed. Further, the plaintiffs do not allege that the Plan relied upon any alleged statement or omission of any of these defendants. For this same lack of reliance, these defendants argue that plaintiffs' state law claims of intentional and negligent misrepresentations lack merit. These defendants further assert that they did not owe any contractual obligations to the

trustees.

plaintiffs as any contract was between the plaintiffs and Compass E or its successor, the MeersPierson Fund Services. The plaintiffs respond that these contentions were presented in earlier motions that the Court denied.

In their motion to dismiss (Docket Entry No. 49), defendants Compass E; Beacon, Ltd.; Groth and Henrich assert that this Court lacks personal jurisdiction over them because they have not performed any act or engaged in any transaction in Tennessee, nor have they availed themselves of the privilege of doing business in Tennessee. Further, these defendants argue that the consequences of the alleged unlawful acts occurred in California, the Plan's and the trustees' residence. The alleged acts of Compass E and Beacon, Ltd. occurred in Virginia. The plaintiffs respond that these contentions were advanced in the earlier motions to dismiss that the Court denied. The plaintiffs also assert that defendants Henrich and Groth are personally liable for defendant Demachy and that the other entities in this action were merely fronts or dummies. The plaintiffs note that defendant Van Hedge is located in Nashville and was the agent of the Beacon defendants, Compass E and Demachy and, because the securities claim is under a federal statute, the presence of their agent in Tennessee is sufficient for jurisdiction over these defendants.

As to the defendants' motions to dismiss (Docket Entry Nos. 47 and 49), these motions challenge the sufficiency of the pleadings; and in light of the Court's orders (Docket Entry Nos. 24 and 35) sustaining the legal sufficiency of the complaint, the Court applies the law of the case doctrine, *State of Arizona v. State of California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), to deny these motions. The Court notes that many of the issues raised in these motions are also raised in the motions for summary judgment. The Court applies the more stringent Rule 56 standards to the disposition of these contentions upon consideration of those motions. *Serras v. First Tennessee Bank Nat'l Assn.,* 875 F.2d 1212, 1214 (6th Cir. 1989) ("A threshold determination that personal jurisdiction exists does to relieve [the plaintiffs] at the trial of the case in chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.") As discussed, under Rule 56 case law, upon a motion for summary judgment, the plaintiffs must present sufficient facts to support a judgment on their claims.

## 5. Defendants' Motions for Summary Judgment

In their motion for summary judgment (Docket Entry No. 58), defendants Demachy, Anselin, Springle and Watts assert this Court's lack of personal jurisdiction over them because (1) they did not purposely avail themselves of acting in Tennessee or cause any consequence in Tennessee; (2) the plaintiffs' claims did not arise in Tennessee; (3) the alleged acts of defendant Compass E are not sufficiently substantial to justify jurisdiction; and (4) the plaintiffs' section 10(b)(5) claim is barred by the applicable statute of limitations. These defendants also argue that the plaintiffs' claims for intentional and negligent misrepresentation should be dismissed because the plaintiffs do not allege that these defendants made any misrepresentations upon which the plaintiffs relied. Further, the plaintiffs' breach of contract claim lacks merit as to them because, as a matter of law, any contractual obligations extend only to the parties to the contract and the private placement memorandum. Thus, any contractual obligations to plaintiffs extend only to defendant Compass E or its successor, MeersPierson. In support of their motion, these defendants offer affidavits and excerpts from discovery depositions.

In response, the plaintiffs assert, in sum, that (1) these grounds were previously argued and rejected by the Court; (2) for claims arising under federal statutes, the presence of an agent within a state is

sufficient to establish personal jurisdiction over the agent's principals; (3) the initial contact for the sale of the securities was with the defendants' agent in Tennessee; (4) although the plaintiffs inadvertently failed to allege reliance in paragraph 32 of the first amendment complaint, such reliance is alleged in paragraph 34; and (5) defendants Groth and Henrich are the real parties in interest and are the principals for Demachy and MeersPierson who administered the plaintiffs' contract.

In their motion for summary judgment (Docket Entry No. 67), defendants Van Hedge and Mr. Lonsdorf argue that the undisputed facts show that the plaintiffs did not rely upon information provided by Van Hedge or Mr. Lonsdorf and the plaintiffs' decision to invest in Compass E was due to a trustee's independent evaluation of Mr. Bush. These defendants also argue that there is no evidence that they acted with any intent to defraud. These defendants note that even after Mr. Bush left Compass E, the plaintiffs continued to hold the investment in Compass E. Thus, the plaintiffs' securities claim is time-barred because the plaintiffs knew in January, 1996, that Mr. Bush would be replaced and, despite being informed that the investment was losing value, continued to hold the investment. This action was not filed until April 2, 1998, beyond the applicable one year statute of limitations. These defendants also assert the Plan's lack of standing because a plan is not an entity that is capable of suing or being sued and without standing, there is no case or controversy. Further, these defendants contend that there is a lack of diversity for the plaintiffs' state law claims and that the plaintiffs have failed to join an indispensable party.

Defendants Compass E; Beacon, Ltd.; Beacon, Inc.; Groth; Henrich; Demachy; Anselin; Springle and Watts all moved to file supplemental materials in support of their motion for summary judgment. Motion (Docket Entry No. 103). This motion is granted.

For the reasons set forth below, the Court concludes that with the granting of the motion to amend, the substituted plaintiffs now possess standing to pursue all of their claims and, as trustees of the Plan, all the necessary parties are before the Court. The Court further concludes that the plaintiffs' securities claim is time-barred under the applicable statutes of limitations. The plaintiffs knew or reasonably should have known of the critical facts giving rise to their securities claim by October, 1996, and at the latest by March, 1997, more than a year before the filing of this action. Between October, 1996, and March, 1997, the plaintiffs were aware or reasonably should have been aware that (1) from a market publication in October, 1996, that Mr. Bush had defrauded his investors; (2) from the same report, that Mr. Bush used a fictitious audit of his investment performance that was published in Compass E's offering memorandum; (3) Mrs. Esterkyn believed some statements made by certain defendants in December, 1996, about the Plan's investment to be false; (4) Mr. Bush had been removed as Compass E's investment manager in January, 1996; and (5) by March, 1997, the Plan's investment had suffered another devastating loss. The Court concludes that the plaintiffs' negligent and intentional misrepresentation claims lack merit against all defendants because the Plan's decision to invest in Compass E was based upon its trustee's independent research, not any conduct or representation of these defendants. Given the express disclosure that Compass E had not audited the reports in its private placement memorandum and its separate representation of Mr. Bush's alleged performance record, there was no implied representation that Mr. Bush's investment record was Compass E's performance record.

Although the plaintiffs assert that they did not receive the full value of their stock after their redemption request, the Court concludes that this contract claim obtains only as to defendant Compass E. None of

the other defendants owed any written contractual duty to the plaintiffs. Moreover, the proof does not establish that any one or more of the remaining defendants caused the failure to refund the plaintiffs the then full value of plaintiffs' stock in Compass E.

## II.

The Plan is a qualified pension plan organized under the laws of California. Plan's responses (filed October 7, 1998; Docket Entry No. 82) to defendants' statement of undisputed facts, ¶ 1. Samuel H. Esterkyn, a physician, and his wife Sharon Esterkyn are the Plan's trustees. *Id.*, ¶ 2. Mrs. Esterkyn [1] has actually been selecting the investments for the Plan for the last twenty-five years. Plan's responses (filed October 7, 1998; Docket Entry No. 84) to defendants' statement of undisputed facts, ¶ 2. Mrs. Esterkyn is a graduate of Stanford University with a degree in speech and drama. Brief (Docket Entry No. 63), Exhibit 1 (deposition of Sharon M. Esterkyn) at 7. In her investment decisions, Mrs. Esterkyn consults friends, professional investment advisors, including an accountant, and does her own "research and reading" on potential investments for the Plan. *Id.* at 13, 123.

In 1995, Mrs. Esterkyn read an article in *"Worth"* magazine about Mr. Bush, a money manager. Plan's response (Docket Entry No. 82), ¶ 7. Mrs. Esterkyn then researched the *New York Times, Wall Street Journal* and *Barron's* about Mr. Bush for "anything damaging" about him. *Id.*, ¶ 8. Mrs. Esterkyn was so impressed with Mr. Bush's investment record, that she called his office in California, but was referred to Van Hedge in Tennessee. *Id.*, ¶¶ 9 and 10. When Mrs. Esterkyn called Van Hedge in Tennessee, she spoke with Steven Lonsdorf, an officer of Van Hedge

who told her about Compass E, a hedge fund [2] managed by Mr. Bush. *Id.*, ¶ 11.

Mr. Lonsdorf told Mrs. Esterkyn that Van Hedge had in excess of 2,000 hedge funds and Mr. Bush was Van Hedge's No. 1 rated advisor. *Id.* at 17. Although the complaint alleges that Mrs. Esterkyn understood that Van Hedge was a sales agent for Compass E, she testified that she could not remember whether Van Hedge was a sales agent for Compass E or for Mr. Bush. Plan's responses (filed October 7, 1998; Docket Entry No. 86) to defendants' statement of undisputed facts, ¶ 9.

In any event, Mrs. Esterkyn asked for and received from Mr. Lonsdorf a prospectus or "Private Placement Memorandum" about Compass E that contained a supplement for investors from the United States. Plan's responses (Docket Entry No. 82), ¶¶ 12, 13 and 16; *see also,* brief (Docket Entry No. 63), Exhibit 1 at exh. 1. Mrs. Esterkyn also received information on Van Hedge, including a letter from Mr. Lonsdorf highlighting Mr. Bush's performance record. *Id.* at 110. Prior to the purchase of Compass E stock, Mrs. Esterkyn never had any communication with Mr. Bush or anyone representing Mr. Bush, other than Mr. Lonsdorf about this investment. *Id.* at 131.

According to its private placement memorandum, Compass E's investment objectives were to purchase equities in "out of favor companies" and use margins and selling securities short to achieve substantial capital appreciation. *Id.*, exh. 1 at 3. This approach is referred to as "contrarian." Affidavit of Robert Henrich (filed September 21, 1998; Docket Entry No. 64), attachment 1. These investment strategies pose a "greater financial risk than strategies of less aggressive investment funds." Brief (Docket Entry No. 63), Exhibit 1, exh. 1 at 3. In addition, the PPM

---

1. Due to her extensive involvement, except where otherwise noted, all references to Esterkyn are to Sharon Esterkyn.

2. As described by Mrs. Esterkyn, "protection of one's principal is extremely important in a hedge fund." Brief (Docket Entry No. 63), Exhibit 1 at 95.

disclosed that "[t]he Company's ability to make a profit will depend largely upon the success of the Investment Manager...." *Id.*, Exhibit 1, exh. 1, supplement at 5. In a supplemental disclosure statement, Compass E was established as a "Passive Foreign Investment Company" under the Internal Revenue Code. *Id.*, Exhibit 1, exh. 1, supplement at 7.

The PPM warned investors to read its provisions in their entirety.

Investors should read this private placement memorandum in its entirety and rely only on statements made herein. The investor shares described herein are offered solely on the basis of information contained in this memorandum, and any further information given or representations made by any person may not be considered as having been authorized by the company.

*Id.*, Exhibit 1, exh. 1 at ii.

Mrs. Esterkyn read the PPM as well as its explanatory notes. *Id.*, Exhibit 1 at 111. Among those notes was the following disclosure: "All information herein is from sources believed to be reliable. Data are not necessarily audited or independently verified." *Id.* at 112.

It must be noted that in a letter, dated December 10, 1994, concerning his company's assessment of Mr. Bush's investment performance, David Campbell held himself out as a certified public accountant to Mr. Bush. Henrich affidavit (Docket Entry No. 64), attachment thereto. Mr. Henrich asserts in his affidavit that Compass E relied upon this letter in preparing its prospectus. *Id.* 7. Mr. Henrich insists that when he and "other persons involved in the management of the defendant entities learned" that Mr. Bush's figures had not been audited as represented, Mr. Bush was replaced. *Id.*, ¶ 8.

Yet, in a letter dated May 30, 1995, Maria M. Perero of Ernst and Young informed Mr. Henrich at Beacon, Inc., that David Campbell of Campbell, Campbell & Co., who performed the audit of Mr. Bush's investment, "is not a licensed CPA in the State of California." Plan's opposition (Docket Entry No. 81), attachment thereto at Exhibit 13. Ernst and Young declined to provide "a perceived opinion on investment performance results of BBIM," Mr. Bush's company. *Id.*

Under the PPM, "All disputes and controversies shall be resolved by reference to the laws of the Commonwealth of the Bahamas." Brief (Docket Entry No. 63), Exhibit 1 at 17.

Mrs. Esterkyn decided to make the Compass E investment because she "was sufficiently impressed with the record that had been specified for [Bush] in Worth magazine." *Id.* at 16. As to the basis for the investment decision, Mrs. Esterkyn states, "I was more interested in the fact that Ben Bush was their advisor." *Id.* at 30. In fact, Mrs. Esterkyn refused to pay Mr. Lonsdorf the finder's fee that he requested, *id.* at 107, stating

Q. Because you were relying on your own research and your own judgment; isn't that correct?

A. That's correct.

*Id.*

Mrs. Esterkyn admitted that she did not rely on Mr. Lonsdorf's evaluation of Mr. Bush, and that it was just "one more deciding factor." Plan's responses (Docket Entry No. 86), ¶ 14. Among the provisions of the documents the Esterkyns signed for the Plan's purchase of Compass E stock was a question that they answered affirmatively: "I did not retain a professional advisor to advise me as to the merits and wishes of a prospective investment in the Company." Brief (Docket Entry No. 63), Exhibit 1 at exh. 3, U5–2–1. Mrs. Esterkyn also did not believe that Van Hedge had independently verified the Campbell, Campbell & , Co. audit of Mr. Bush's performance. *Id.*, Exhibit 1 at 112.

This PPM also addressed the roles of Beacon, Ltd., and Demachy, as well as its officers and directors:

**The Asset Management Consultant**

The Company's Asset Management Consultant is Beacon Global Advisors, Ltd. (the "Asset Management Consultant") a Bahamian corporation organized in 1994. In addition to its activities on behalf of the Company, the Asset Management Consultant also advises with respect to several other companies, institutions and individual clients engaged in various specialized investment programs.

The Asset Management Consultant performs its services pursuant to an Asset Management Advisory Agreement (the "Agreement") with the Company dated as of November 30, 1994. Pursuant to the terms of the Agreement, the Asset Manager Consultant has agreed to manage all aspects of the investment advisory services provided to the Company, including the selection and evaluation of investment managers.

**Banking and Custody**

Demachy Worms & Co. International Ltd. ("Demachy"), serves as the Company's banker for purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions not directly related to the Company's portfolio. Custodians selected by the Investment Manager serve as the principal custodians of the Company's portfolio assets. Currently this is a prime brokerage account at Bear Sterns & Co., Inc., San Francisco, CA. Portfolio assets of the Company which are not held by this entity will be held by Demachy Worms or by broker-dealer firms selected by the Investment Manager.

. . . .

**Board of Directors**

The Company is operated by its directors, none of whom will receive direct compensation for serving in such capacity. The directors are also directors and senior officers of the Company's Banker and Administrator:

**Renaud Anselin** is a Director of Demachy Worms & Co. International Ltd. and Managing Director of Beacon Global Advisors, Ltd. Mr. Anselin has been associated with the Worms Group since 1981 and holds a diploma from the Ecole des Sciences Politiques of Paris, France.

**Ronald W. Springle** is the Financial Controller of Demachy Worms & Co. International Ltd. and is responsible for maintaining effective control over all financial matters pertaining to the Bank and clients thereof and also ensuring accuracy and prompt reporting by the Bank, its managed companies and mutual funds. Prior to joining the Worms Group in 1990, Mr. Springle served as the Chief Accountant for Rawson Trust Company Limited responsible for trusts and managed companies and served as coordinator of all mutual funds for which N.A.V.'s had to be calculated. Prior thereto he was the Manager of the Trust Department of KPMG in Nassau, Bahamas.

**John F. Watts** is a Senior Vice President of Demachy Worms & Co. International Ltd. and is responsible for management of companies and trusts. Prior to joining the Worms Group in 1988, Mr. Watts was the Manager of the Company and Trust Department of Leu Trust & Banking (Bahamas) Ltd. From 1966 until 1985, Mr. Watts held a number of positions with the Bank of Nova Scotia Trust Company (Bahamas) Limited, during which time he had the opportunity to work in all of that trust company's departments. Prior to leaving "Scotia Trust", Mr. Watts held the position of Assistant Manager responsible for trusts and company management.

It is anticipated that the Board of Directors will meet regularly to review the investment affairs of the Company. The Board is not responsible for the day-to-day operations of the Company, nor is it responsible for making or approving any investment decisions. The Company's Memorandum and Articles of Association provide that the *Directors shall not be liable to the Company for any acts or omissions in the perfor-*

*mance of their duties in the absence of willful misconduct, gross negligence or as otherwise required by law,* and contain provisions for the indemnification of the Directors by the Company, to the extent permitted by law, against liabilities to third parties arising in connection with the performance of their services.

*Id.,* Exhibit 1, exh. 1 at 8–9 (emphasis added).

The PPM also explained that contracts had been executed with these companies and the company considered these contracts to be "material."

(1) a contract with Demachy Worms & Co. International Ltd. for the provision of custodial and banking services, as well as administrative services.

(2) a contract with Ben Bush Investment Management, Inc., pursuant to which Ben Bush will act as Investment Manager and provide trading and investment management services; and

(3) a contract with Beacon Global Advisors, Ltd., pursuant to which Beacon Global will act as Asset Management Consultant and will provide management, operational and organizational services for the Company as well as investment management evaluation and monitoring services.

*Id.* at 16. As pertinent here, among the PPM's significant provisions was a chart on a separate page reflecting Mr. Bush's "Audited Gross Returns" that was disclosed as "prepared by David Campbell of Campbell, Campbell & Co." *Id.,* Exhibit 1, exh. 1 at 7.

The defendant Demachy is a Bahamian bank. Plan's responses (Docket Entry No. 84), ¶ 7. Mr. Anselin worked there until 1995 or 1996. *Id.,* ¶ 8. Mr. Anselin does not recall when he first saw the prospectus on Compass E, but presumes he saw it shortly after it was prepared. *Id.,* ¶ 11. Mr. Watts is the resident manager of W & P Bank & Trust Company Limited, Demachy's successor. *Id.,* ¶ 12. Defendants Watts, Anselin and Springle served as di-

rectors of Compass E from its inception until October 1, 1996, when Messrs. Springle and Watts resigned. *Id.,* ¶ 13. The management and administration of Compass E were transferred to MeersPierson Fund Services (Dublin) Limited in Dublin, Ireland. *Id.* Mr. Anselin remains a director of that company. *Id.* Demachy set up Beacon, Ltd., at the instruction of Beacon, Inc., but Demachy's clients were Messrs. Groth and Henrich of Beacon, Inc., and Beacon, Ltd. *Id.,* ¶ 15.

Demachy structured and administered the Compass E Series. *Id.,* ¶ 16. Demachy also calculated the net asset value of the Compass E Series at the end of each month from information given to the Bank from Lehman Brothers and/or Bear Stearns. *Id.* Demachy also supplied these figures to the shareholders. *Id.*

Mrs. Esterkyn had no direct written or verbal communication with defendants Springle, Watts, or Anselin. Plan's responses (Docket Entry No. 84), ¶ 22. Mrs. Esterkyn only had a *"pro forma"* telephone conversation with a female at Demachy's office. *Id.,* ¶ 23. Other than this one possible communication with the female individual from Demachy, Mrs. Esterkyn did not make other telephone calls to the Bahamas. *Id.,* ¶ 24. Mrs. Esterkyn could not explain why this action was filed in Tennessee. *Id.,* ¶ 25.

After conferring with her husband, Mrs. Esterkyn decided to invest $500,000.00. Plan's responses (Docket Entry No. 82), ¶ 15. The Esterkyns signed a subscription agreement on August 30, 1995. Brief (Docket Entry No. 63), Exhibit 1 at 127 and attachment, exh. 3. The purchase price of the investment was paid sometime after September 6, 1995. *Id.,* Exhibit 1 at exh. 5.

By the end of 1995, the Plan's investment in Compass E had lost more than $100,000.00 in value. Plan's responses (Docket Entry No. 82), ¶ 18. Mrs. Esterkyn began to inquire about Compass E's losses and in December, 1995, after a "large decline," she spoke to Messrs.

Groth or Henrich. *Id.*, ¶ 21. In her first call, Mrs. Esterkyn was told that a "precipitous decline" occurred because "Bush had invested in one company which it appeared had not been honest with them." Brief (Docket Entry No. 63), Exhibit 1 at 45.

In early 1996, Mrs. Esterkyn learned that Mr. Bush was to be removed as investment advisor to Compass E. *Id.* at 114. Defendants Anselin and Watts sent Dr. Esterkyn a letter dated January 17, 1996, informing him of this proposed change in managers and Mr. Groth sent a letter dated January 31, 1996, to Dr. Esterkyn informing him of the addition of The Abernathy Group. *Id.* at Exhibit C. Mrs. Esterkyn deemed Mr. Bush's replacement "a curious event, considering that Mr. Bush had been so highly touted, for him to be replaced so suddenly." Plan's responses (Docket Entry No. 82), ¶ 25.

In opposition to the motion for summary judgment, the plaintiffs submitted a publication entitled "Private Asset Management" dated October 21, 1996, that contains a report that the Securities and Exchange Commission had sued Mr. Bush and his investment company for fraud in their dealings with investors. Plan's responses (Docket Entry No. 81), Exhibit C. This report also disclosed that the address of Mr. Bush's auditor, who is mentioned in the Compass E's PPM, was a Subway sandwich shop. *Id.* at 2.

In conversations with defendants Henrich or Groth in December, 1996, and January, 1997, Mrs. Esterkyn began to doubt their representations to her, and she considered them to be false. Brief (Docket Entry No. 63), Exhibit 1 at 63–67, 70. In December, 1996, Mr. Groth told Mrs. Esterkyn that Mr. Bush was in a little trouble, but Mrs. Esterkyn considered Mr. Bush "in a lot of trouble." *Id.* at 70. Mrs. Esterkyn would have redeemed the Compass E stock by the end of the 1996, but for statements by defendants Groth or Henrich about litigation that Compass E was considering against an insurance company. *Id.* at exh. 8. Mrs. Esterkyn was told that to participate in any settlement she would have to be a current holder of stock. *Id.* In January, 1997, Mrs. Esterkyn again had conversations with defendants Henrich or Groth that she considered to be false misrepresentations, to the effect that, if she redeemed the Compas E stock, the Plan could not participate in a settlement fund from litigation brought by Compass E. *Id.* Mrs. Esterkyn stated that she considered redemption in March, 1997, but was again told that if she redeemed the stock, the Plan could not participate in any settlement of the litigation initiated by Compass E. *Id.* at 48.

By March, 1997, the Plan's accountant "was devastated" by Compass E's performance. Plan's responses (Docket Entry No. 82), ¶ 26. By April 1, 1997, the Plan's investment in Compass E had lost an additional $130,000.00 in value. *Id.*, ¶ 18. Mrs. Esterkyn characterized Compass E's April, 1997, loss as "shocking". Brief (Docket Entry No. 63), Exhibit 1 at 50. At that time, Mrs. Esterkyn was told that Compass E had been liquidated and her investment had been placed in a money market fund. *Id.*

Mrs. Esterkyn then decided to liquidate the Plan's investment. *Id.* at 52. She did not liquidate earlier based upon defendants Groth's and Henrich's representation of the Plan's participation in a settlement fund from litigation involving Compass E. *Id.* at 53.

In June, 1997, Mrs. Esterkyn sent a redemption request to MeersPierson in Ireland, but Mr. Groth told her that MeersPierson had not received her redemption letter and that she would have to send another one. *Id.* at 56–57. Mrs. Esterkyn's attempt to liquidate in June, 1997, was unsuccessful. Sometime prior to July, 1997, Mrs. Esterkyn received an audit report of Ernst & Young. *Id.* at 55. The action was filed on April 2, 1998. Complaint (Docket Entry No. 1).

### III.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the plaintiff's action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.,* 921 F.2d at 1349; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [3] *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.,* 921 F.2d at 1349. The non-moving party may not merely rest on conclusory statements contained in the pleadings, but must respond with affirmative evidence supporting its contentions and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324,

106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equipment Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

### IV.

#### 1. Personal Jurisdiction

The threshold issue is the non-Tennessee defendants' challenge to this Court's exercise of personal jurisdiction over them.

Where, as here, the challenge to the Court's exercise of personal jurisdiction over a defendant arises in an action under federal law, a "district court's power to exercise personal jurisdiction derives from the Due Process Clause of the Fifth Amendment." *Omni Capital Intern. Ltd. v. Rudolf Wolff & Co. Ltd.,* 484 U.S. 97, 102, 108 S.Ct. 404, 408, 98 L.Ed.2d 415 (1987). In a subsequent decision, involving an action under a different federal statute by bondholders against a foreign nation that had marketed its "bonods" or bonds, *inter alia,* in the United States, the Supreme Court considered the foreign country's challenge to the District Court's jurisdiction over it and stated:

> We conclude that Argentina's issuance of Bonods was a "commercial activity" under the FSIA; that its rescheduling of the maturity dates on those instruments was taken in connection with that commercial activity and had "a direct effect" in the United States; and that the Dis-

---

**3.** The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

trict Court therefore properly asserted jurisdiction, ... over the breach-of-contract claim....

*Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 620, 112 S.Ct. 2160, 2169, 119 L.Ed.2d 394, 408–409 (1992).

■ As applied here, the non-Tennessee defendants knew that investments in Compass E stock would be marketed throughout the United States. The PPM stated that the sales activity of the company in the United States would include trading and investments programs offered through brokers, dealers and custodians, some of which are in the United States. The supplemental disclosure form was prepared expressly for American investors and states that "with the consent of the company," Compass E shares can be sold in the United States. The subscription agreement requires a listing of any agent or "registered representative" of Compass E that the investor used in making this investment. Brief (Docket Entry No. 63), Exhibit 1, exh. 3 at 5. In fact, Mr. Watts sent a letter on Demachy letterhead to Van Hedge setting forth Beacon, Ltd.'s compensation for Van Hedge's sales of Compass E's stock. Plan's responses (Docket Entry No. 84), Exhibit C; plan's responses (Docket Entry No. 86), Exhibit A. Although the PPM declared that Compass E's activity did not subject it to federal taxes, Compass E was a "investment company" under the U.S. Investment Company Act of 1940. Brief (Docket Entry No. 63) Exhibit 1, exh. 1 at ii.

The PPM listed Ben Bush's Investment Management, Inc., as its investment advisor. *Id.* at 1. The PPM also listed Demachy, Beacon, Ltd., and Messrs. Anselin, Springle and Watts as involved in this investment pursuant to contracts with Compass E that the Company deemed material. *Id.* at 1, 8. Mr. Bush's company referred Mrs. Esterkyn to Van Hedge and Mr. Lonsdorf in Tennessee who had Compass E's PPM and were offering investments in Compass E stock in Tennessee.

■ Although Beacon, Inc., a Delaware corporation, and Messrs. Groth and Henrich, who are Maryland citizens, are not listed in these papers, Beacon, Inc., is Beacon, Ltd.'s parent and Messrs. Henrich and Groth of Beacon, Inc., handled any inquiries about plaintiffs' investment in Compass E that originated from a sale of stock in Tennessee. For a parent and its subsidiary, the acts of one in a foreign state can result in submission of the other to personal jurisdiction. *See Third National Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1090 (6th Cir. 1989). Under these circumstances, the Court concludes that these defendants' marketing of these investments through designated agents in the Tennessee market and in this District is sufficient to invoke the Court's personal jurisdiction over them.

### 2. Statute of Limitations

Of the defendants' various contentions, the Court considers first whether the plaintiffs' federal securities claim is time-barred. Summary judgment can be awarded on the basis of the statute of limitations in a securities action. *Gaudin v. KDI Corp.,* 576 F.2d 708, 714 (6th Cir. 1978). "[T]he Court may determine the commencement date for a statute of limitations when ruling on a motion for summary judgment." *Logan v. Ledford,* 699 F.Supp. 141, 145 (M.D.Tenn.1988). This Court also observed that accrual of a claim may be an appropriate issue to address on a pretrial motion. *Nichols v. Merrill Lynch Pierce Fenner & Smith,* 706 F.Supp. 1309 (M.D.Tenn.1989).

■ In *Lampf v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court adopted a statute of limitations for Section 10(b)–5 actions that provides that an action must be brought within one year after the discovery of a cause of action, or three years after such violation, whichever comes first. *Lampf,* 501 U.S. at 360, 111 S.Ct. 2773, 115 L.Ed.2d 321. The Supreme Court stated

that three years was the absolute maximum period of time within which a Section 10(b)–5 case could be brought and that the equitable tolling doctrine did not apply to Section 10(b)–5's statute of limitations. *Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782, 115 L.Ed.2d 321.

Utilizing the limitations periods for actions under Sections 9(e) and 18(c) of the 1934 Act and Section 13 of the 1933 Act that serve comparable remedial purposes to Section 10b, the Supreme Court ruled as pertinent here:

> The 1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary.
>
> . . . .
>
> Litigation instituted pursuant to § 10(b) and Rule 10b–5 therefore must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation. As there is no dispute that the earliest of plaintiff-respondents' complaints was filed more than three years after petitioner's alleged misrepresentations, plaintiff-respondents claims were untimely.

*Lampf,* 501 U.S. at 363–64, 111 S.Ct. at 2782, 115 L.Ed.2d at 336 (footnote and citations omitted).

■ The critical question is when the plaintiffs' securities claim arose or when the limitations period began to run. Under federal law, a statute of limitations begins to run when "the fraud is or should have been discovered." *Gaudin,* 576 F.2d at 712, quoting *Vanderboom v. Sexton,* 422 F.2d 1233, 1240 (8th Cir.) *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). *Accord, Ockerman v. May Zima & Co.,* 27 F.3d 1151, 1155 (6th Cir.1994) (citing *Lampf*). The Sixth Circuit requires an investor to exercise reasonable care in discovering the alleged securities fraud. *Gaudin,* 576 F.2d at 713. The Court also imposes upon a party the duty to use due diligence in discovering the existence of any type of claim. *Dayco Corp. v. Good-*

*year Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975).

■ To decide when the plaintiffs here should have discovered their § 10(b)(5) claim, the Court adopts as factors to be considered, the factors for the reasonable reliance element of a substantive Section 10(b)(5) claim.

> Determinations of whether an investor's reliance was justified [or exercised due diligence] requires the consideration of all relevant factors, including: (1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant; (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8)[sic] the generality or specificity of the misrepresentations. No single factor is dispositive; all must be considered and balanced in determining whether reliance was justified.

*Bruschi v. Brown,* 876 F.2d 1526, 1529 (11th Cir.1989).

■ Here, at the time of the Plan's investment in Compass E, Mrs. Esterkyn had twenty-five years of experience investing for the Plan. Mrs. Esterkyn did her own independent research for the Plan's investments, consulted with accountants and other investors on the Plan's investment and even conducted her own independent research on Mr. Bush, the investment manager for Compass E. The Court concludes that Mrs. Esterkyn is a sophisticated investor.

There was not any long-standing relationship between the plaintiffs and these defendants.

As to access to market reports, the plaintiffs submitted a publication entitled "Private Asset Management," dated Octo-

ber 21, 1996, that clearly discloses the SEC's legal action against Mr. Bush for fraud in his dealings with investors and the fictitious address of the auditors of his alleged investment performance record. From the description of her research, the Court concludes that Mrs. Esterkyn had significant access to pertinent market information.

As to the fiduciary relationship, Compass E's PPM made it clear that directors would be liable only for wilful fraud or gross negligence. With this language, the Court concludes that the parties did not contemplate a fiduciary relationship.

As to the final two factors, the plaintiffs' investment decision was made in August and September, 1995, based upon Mrs. Esterkyn's assessment of Mr. Bush's performance as a manager of other investments. The failure of the defendants (other than Van Hedge and Mr. Lonsdorf) to disclose Mr. Campbell's misrepresentation of himself as a CPA in his report of Mr. Bush's investment record is a material omission. Any concealment of fraud, however, was short lived, as by December, 1995, the plaintiffs' investment lost $100,-000.00. In a January 17, 1996, letter, Mr. Esterkyn was informed of a recommendation to replace Mr. Bush that was effective by the end of January, 1996. Mrs. Esterkyn deemed Mr. Bush's quick removal to be "curious." The SEC's legal action against Mr. Bush for fraud was publicly reported on October 21, 1996. That publication also revealed Mr. Campbell's fraudulent acts. In December, 1996, Mr. Groth told Mrs. Esterkyn that Mr. Bush was in a little trouble, but Mrs. Esterkyn considered Mr. Bush to be "in a lot of trouble." From December, 1996, to January, 1997, Mrs. Esterkyn believed statements from defendants Henrich and Groth about the Plan's investment to be false. By March, 1997, Mrs. Esterkyn believed statements by Compass E's management about the management of the Plan's investment to be false. By March, 1997, the plaintiffs lost another $130,000.00 in value, i.e. approxi-

mately one-half of their original investment in an otherwise successful market. Mrs. Esterkyn deemed this loss "shocking," given her understanding of hedge funds.

The Court concludes that the plaintiffs' § 10(b)(5) claim accrued by October 21, 1996, but certainly no later than March 3, 1997, the date of the March, 1997, report when Mrs. Esterkyn knew the Plan's investment had been steadily losing money and its key managers were engaged in what she believed to be misrepresentations about the management of the Plan's investment. In October, 1996, Mrs. Esterkyn knew or reasonably should have known from her access to independent market research that Mr. Bush, the principal figure who precipitated her investment, was charged by the SEC with defrauding his clients and using a bogus representation about his auditors. With the replacement of Mr. Bush in January, 1996, and the steady and substantial decline in the Plan's investment, the Court concludes that the plaintiffs' claim accrued at its latest in March, 1997. This action was filed April 2, 1998. Thus, the Court concludes that plaintiffs' section 10(b)(5) claim is time-barred.

### 3. Reliance

█ Even if the plaintiffs' securities claim is not time-barred, a critical requirement for the securities claim is proof of "a causal connection between the defendants' alleged fraud and the plaintiff's decision to purchase the security." *Ockerman,* 27 F.3d at 1158. The Court concludes based upon the above analysis, that as to the plaintiffs' investment, Mrs. Esterkyn's testimony establishes that she relied upon her independent reading of the *"Worth"* article on Mr. Bush and her additional research of him in the *New York Times, Wall Street Journal* and *Baron's* in making the investment, and not on any representations of these defendants.

To be sure, there is proof that months prior to the Plan's investment, the Bahamian defendants knew that Mr. Campbell,

who prepared the Bush audit, was not a CPA as he had represented. Yet, Mrs. Esterkyn's initial contact through her research was with Mr. Bush's office, and not these defendants. The PPM disclosed that it had not prepared Mr. Bush's "audited investment record" and did not verify the report. The PPM did not represent Mr. Campbell as a CPA. There are no facts to suggest that the PPM implied that Mr. Bush's investment record was Compass E's investment record. There are also no facts presented that the representations about the Plan's participation in a settlement fund in proposed or actual litigation against an insurance company was, in fact, false or materially misleading. Thus, the plaintiffs' proof fails to establish the element of reliance required for their section 10(b)(5) claim.

### 4. Plaintiffs' State Law Claims

■ As to the plaintiffs' state law claims, for which they invoke federal diversity jurisdiction, 28 U.S.C. § 1332, the threshold issue is this Court's jurisdiction over the non-Tennessee defendants. In a diversity case, jurisdiction is determined at the time of the filing of the original complaint. *See Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 672 (6th Cir.1988) ("[d]iversity jurisdiction ... is determined at the outset of a lawsuit....").

■ At the time of the filing of the original complaint, there were federal and state law claims. For the reasons stated earlier, the Court possesses personal jurisdiction over all defendants on the plaintiffs' federal securities claim that would allow the Court's exercise of supplemental jurisdiction over pendent or state law claims. 28 U.S.C. § 1367(a). Moreover, for the reasons stated on the personal jurisdictional challenge on the federal claim, the Court concludes that the non-Tennessee defendants purposely availed themselves of marketing, selling and managing Compass E stock throughout the United States, including this district. Thus, this Court possesses specific jurisdiction under 28 U.S.C. § 1332 over the

defendants on plaintiffs' state law claims. *WEDGE*, 882 F.2d at 1090, 1091 n. 2, 1092.

As to the applicable law governing the plaintiffs' state law claims, they argue that the Court should apply California law to the fraud or intentional and negligent misrepresentations claims because the false representations about Mr. Bush's audit and the plaintiffs' actual investment occurred in California. Plaintiffs' motion (Docket Entry No. 94) *in limine*. Van Hedge, a Tennessee corporation with its principal place of business in Nashville, and Mr. Lonsdorf, a Tennessee citizen, both lack any ties to California, and argue that to apply California law to them is unfair.

In a diversity action, the district court is obliged to apply the law of the forum. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In addition, the conflict law of the forum determines which state's substantive law shall apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 392 (6th Cir.1982) *cert. denied, Chattem, Inc. v. Bailey*, 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986). With these principles in mind, an examination of Tennessee's choice of law principles is necessary.

■ For the plaintiffs' contract claim, under Tennessee law, the general rule is that the validity of a contract and the substantive rights of the parties thereunder, are governed by the law which the parties elected to govern their relations absent a sham or lack of any direct and relevant connection to the chosen law of the state or nation in the contract. *Goodwin Bros. Leasing, Inc. v. H. & B., Inc.*, 597 S.W.2d 303, 306, 307 (Tenn.1980), *reh'g denied*, (1980). Here, the PPM clearly reflects that investors would agree that the laws of the Bahamas would govern any legal disputes between them and those Bahamian companies. The residences of the Bahamian defendants who sell and manage

this investment give the selection of Bahamian law a direct and relevant connection to Compass E's contract with its investors.

■ Yet, the defendants do not cite or rely on Bahamian law on the plaintiffs' state law claims. The Tennessee courts hold that "where the law of another state is not proven in the lower court, we must assume that the law of the other state is the same as the law of this state." *Moak v. Continental Casualty Co.*, 4 Tenn.App. 287, 293 (1927). Because the parties did not argue or prove the law of the Bahamas, the Court applies Tennessee law[4] to the plaintiffs' contract claim.

■ A general rule of Tennessee contract law is that only the parties to a written agreement are bound by its terms. *V.L. Nicholson v. Trans. Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 482 (Tenn.1980). The mere fact that a person signed a written contract does not necessarily bind that person to its provisions dependent upon the capacity in which the person was acting. *In re Dickerson's Estate*, 600 S.W.2d 714, 717 (Tenn.1980).

■ From the Court's review of the evidence, none of the defendants signed any agreement with the plaintiffs. There are no signatures from any defendant on the PPM or supplemental disclosures or subscription agreement. Only the plaintiffs signed the subscription agreement before the Court. In a letter dated August 17, 1995, Marcus Bradshaw, whose affiliation is unclear, confirmed the plaintiffs' subscription agreement with Compass E. Brief (Docket Entry No. 63), Exhibit 1 at exh. 5. The Court concludes that the only contract or agreement that the plaintiffs had was with Compass E. The other corporate defendants entered into contracts with Compass E, but not with the plaintiffs.

As pled in the first amended complaint (filed August 21, 1998; Docket Entry No. 43), the breach of contract claim asserts that when the Esterkyns redeemed the Plan's investment, there was a short-fall of $54,024.18 that should have been refunded under the redemption provisions of the "Contract Note" and the "Redemption Procedure of the PPM." *Id.* at 9–10. The plaintiffs, however, do not set forth their contract theory of liability in the final pretrial order (entered March 23, 1999; Docket Entry No. 98) that supplants the pleadings. Transcript (Docket Entry No. 100) at 21–22. The Court could deem this claim to be abandoned. "Rule 16, F.R.Civ.P., provides that the Final Pretrial Order shall 'control the subsequent course of the litigation,' unless modified at the trial to prevent manifest injustice." *Daniels v. Board of Educ. of Ravenna City Sch.*, 805 F.2d 203, 210 (6th Cir.1986) (quoting Fed. R.Civ.P. 16(e)).

In any event, in opposition to the defendants' motions for summary judgment, plaintiffs have not identified facts that any of the non-Compass E defendants caused this alleged short-fall. MeersPierson Fund Services, that valued plaintiffs stock at the time of redemption at $257,922.60, (brief (Docket Entry No. 63), Exhibit 1 at exh. 10), is not a party to this action. The plaintiffs have had ample opportunity to conduct discovery. Absent proof of the identity of the party, other than Compass E that caused the breach of contract and PPM's redemption provisions, the Court concludes that the plaintiffs' contract claim against all other defendants, except Compass E, must be dismissed.

■ For plaintiffs' tort claims of negligent and intentional misrepresentations, Tennessee has adopted the "most significant relationship" test for its choice of law standard.

> The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the oc-

---

4. The plaintiffs' contract claim is not time-barred under Tennessee's six years limitation for such claims. Tenn.Code Ann. § 28–3–109(a)(3).

currence and the parties under the principles stated in § 6 [of the restatement].[3]

---

[3]. § 6. Choice–of–Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability, and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.

*Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn.1992) (quoting *Reinstatement (Second) of Conflict of Laws* §§ 6, 145(1) (1971)).

In choosing the applicable law, the Tennessee Supreme Court cited the following contacts:

Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties,

 (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Hataway,* 830 S.W.2d at 59 (*quoting Restatement (Second) of Conflict of Laws* § 145(2) (1971)).

 Applying these factors, the Court concludes that California is the state with the most significant relationship to the events at issue. California is the situs of Mr. Bush's business and his bogus auditor's residence. The plaintiffs are in California, and the Plan is qualified under California law. The decision to invest was made in California. The injury to the Plan occurred in California. The Court concludes that California law[5] should apply, as California has the most significant relationship to these claims.

 As to the legal sufficiency of the plaintiffs' tort claims under California law, in *Mirkin v. Wasserman,* 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993), the California Supreme Court considered, among others, claims of fraud and negligent misrepresentations in an action involving the sales of securities.

The law of deceit in California is not purely statutory; it is a mixture of statutory and common law. Provisions of the Civil Code that are substantially the same as the common law, such as the provisions that codify common law torts, "must be construed as continuations thereof, and not as new enactments." (Civ.Code § 5.) Civil Code sections 1709 and 1710 have been recognized as continuations of the common law. . . . Thus, it is entirely consistent with those statutes that California courts have always required plaintiffs in actions for deceit to plead and prove the common law element of actual reliance.

---

5. The plaintiffs' claims for intentional and negligent misrepresentations are not time-barred. Under California law, it is generally three years, as negligent misrepresentations

are a species of fraud. *See Loken v. Century 21—Award Properties,* 42 Cal.Rptr.2d 683, 685, 36 Cal.App.4th 263 (1995).

Civil Code Section 1711, ... provides that "[o]ne who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, *who is actually misled by the deceit.*" To the extent it may be relevant here, the statute simply points out that one who makes false representations with fraudulent intent need not have any particular victim in mind. *Litigants* who rely on section 1711 *must still plead and prove actual reliance.* *Mirkin*, 23 Cal.Rptr.2d at 105, 858 P.2d at 572 (emphasis added). In a word, the Court rejected the fraud on the market theory and required proof of "actual reliance" for misrepresentations to be actionable as a negligent or intentional misrepresentation.

 It is undisputed that the PPM and the supplemental disclosure for United States investors clearly disclaimed verification of any data from sources listed in the PPM. Plan's responses (Docket Entry No. 86), ¶ 16. Yet, the failure of Compass E and the defendants (other than Van Hedge and Mr. Lonsdorf) to disclose Mr. Campbell's misrepresentation as a CPA was a material omission, given the inclusion of his report on Mr. Bush's performance record in the PPM. In any event, the subscription agreement signed by the plaintiffs reflects their statement that "I did not retain a professional advisor to advise me as to the merits and risks of a prospective investment in the Company." Brief (Docket Entry No. 63), Exhibit 1, exh. 3 at 6 or beta stamp 100174. As found on the plaintiffs' federal securities claim, the Court concludes from Mrs. Esterkyn's testimony that the plaintiffs' actual reliance in making this investment was upon the results of Mrs. Esterkyn's independent research and assessment of Mr. Bush, not any misrepresentation of any of these defendants.

The Court concludes that the plaintiffs have not shown to have actually relied upon the PPM or any statements of any defendants. The plaintiffs have not shown that any of the statements about the Plan's participation in the settlement fund in proposed or actual litigation were, in fact, false or a misrepresentation. Thus, their fraud or intentional and negligent misrepresentations claims cannot support a judgment under California law.

## V.

From the above, the defendants' motions (Docket Entry Nos. 58, 62 and 67) for summary judgment shall be granted, except as to the plaintiffs' contract claim against Compass E, so as to leave only the contract claim against Compass E for trial. The plaintiffs' motion (Docket Entry No. 94) *in limine* shall be granted as to the plaintiffs' tort claims, but denied as to their contract claim. The defendants' motions (Docket Entry Nos. 47 and 49) to dismiss shall be denied. The motion (Docket Entry No. 91) to show cause shall be granted. The motion (Docket Entry No. 99) to amend pretrial order shall be granted. The motion (Docket Entry No. 103) to file supplemental materials and to file a supplemental argument shall be granted. The motion (Docket Entry No. 105) to amend the style of the case shall be granted as provided in this memorandum.

An appropriate order shall be entered.

### ORDER

In accordance with memorandum contemporaneously entered,

1. The motion (filed September 8, 1998; Docket Entry No. 47) to dismiss by defendants Compass Series E, Ltd.; Beacon Global Advisors, Ltd.; Beacon Global Advisors, Inc.; John H. Groth and Robert Henrich is **DENIED;**

2. The motion (filed September 8, 1998; Docket Entry No. 49) to dismiss by defendants Compass Series E, Ltd.; Beacon Global Advisors, Ltd.; John H. Groth and Robert Henrich is **DENIED;**

3. The motion (filed September 21, 1998; Docket Entry No. 58) for summary judgment by defendants Demachy Worms & Company International, Ltd., Renaud Anselin, Ronald W. Springle and John F. Watts is **GRANTED;**

4. The motion (filed September 21, 1998; Docket Entry No. 62) for summary judgment by defendants Compass Series E, Ltd.; Beacon Global Advisors, Ltd.; Beacon Global Advisors, Inc.; John H. Groth and Robert Henrich is **GRANTED** except as to plaintiffs' contract claim against Compass Series E, Ltd.;

5. The motion (filed September 22, 1998; Docket Entry No. 67) for summary judgment by defendants Van Hedge Fund Advisors, Inc. and Steven A. Lonsdorf is **GRANTED;**

6. The motion (filed December 29, 1998; Docket Entry No. 94) *in limine* by the plaintiffs is **GRANTED** as to plaintiffs' tort claims, but **DENIED** as to the plaintiffs' contract claim;

7. The motion (filed December 2, 1998; Docket Entry No. 91) to show cause by defendants Demachy Worms & Company International, Ltd., Renaud Anselin, Ronald W. Springle and John F. Watts is **GRANTED,** and plaintiff's lead counsel is directed to refrain from any further such attempts. The Court finds that no further sanctions are warranted under the circumstances;

8. The motion (filed March 26, 1999; Docket Entry No. 99) to amend pretrial order by defendants Compass Series E, Ltd.; Beacon Global Advisors, Ltd.; Beacon Global Advisors, Inc.; John H. Groth and Robert Henrich is **GRANTED;**

9. The motion (filed May 24, 1999; Docket Entry No. 103) to file supplemental materials and argument by the defendants is **GRANTED;** and

10. The plaintiffs' motion (filed June 1, 1999; Docket Entry No. 105) to amend the style of case is **GRANTED.** Samuel H. Esterkyn, M.D., and Sharon M. Esterkyn, Trustees, shall be deemed party plaintiffs in this action. However, the caption shall remain the same.

It is so **ORDERED.**